# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JEFFREY GALLAHER AND ROSA　　　:
GALLAHER　　　　　　　　　　　　　　:
　　　Plaintiffs,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:　　　**CIVIL ACTION NO.**
v.　　　　　　　　　　　　　　　　　　:　　　**3:14-cv-1877 (VLB)**
　　　　　　　　　　　　　　　　　　　:
US BANK NATIONAL ASSOCIATION, :　　　May 15, 2017
WELLS FARGO BANK, AND　　　　　:
AMERICAN SERVICING COMPANY, :
　　　Defendants.　　　　　　　　　　:

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Dkt. No. 52]

Plaintiffs Jeffrey and Rosa Gallaher (the "Gallahers" or "Plaintiffs"), proceeding *pro se*, bring this action arising out of a mortgage dispute with Wells Fargo Bank and American Servicing Company ("ASC").[1] ("Defendants").  After the Court's Memorandum of Decision on Defendants' Motion for Summary Judgment, Plaintiff's remaining claims are that Defendants (i) violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*,  by either failing to properly investigate Plaintiffs' disputes or intentionally choosing not to delete information found to be inaccurate and erroneous while reporting as Plaintiffs' creditor and (ii) committed invasion of privacy under Connecticut law invasion of privacy by intentionally and maliciously accessing Plaintiffs' credit report.  [Dkt. 35 at 34.]  For the reasons that follow, the Defendants' Motion for Summary Judgment is GRANTED.

---

[1] The parties agree that ASC is a division of Wells Fargo that services loans for other investors under the ASC name.  [Dkt. No. 17 at ¶ 5; Dkt.  No. 19 at 4, n. 2].

I.    **Factual Background**

 On June 9, 2006, Jeffery and Rosa Gallaher applied to Landmark
Mortgage, LLC for a refinance loan of $580,000.00.  [Dkt. 55-2 (Loan Application).]
In the loan application, Plaintiffs acknowledged that "any owner of the Loan, its
servicers, successors and assigns, may verify or reverify any information
contained in the application or obtain any information or data relating to the
Loan, for any legitimate purpose through any source, including a source named
in this application or a consumer reporting agency."  *Id.* at WF000408.

 On June 23, 2006, Plaintiffs re-applied for a refinance loan to Landmark
Mortgage, LLC for $579,500.00.  [Dkt. 55-4.]  The June 23, 2006 application
included the same acknowledgement language as the June 9, 2006 application.
*Id.* at WF000004.

 Also on June 23, 2006, Plaintiffs executed a balloon note in favor of BNC
Mortgage, Inc. in the principal amount of $579,500.00.  [Dkt. 55-5.]  That same day,
to secure the balloon note, Plaintiffs granted an open-end mortgage deed to
Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for BNC
Mortgage, Inc.  [Dkt. 55-6.]  The deed concerned Plaintiffs' property at 28
Westover Road, Stamford, Connecticut 06902.  *Id.* at WF000013.

 On October 1, 2006, Wells Fargo Bank, N.A. ("Wells Fargo"), Lehman
Brothers Holdings, Inc. ("Lehman Brothers"), Aurora Loan Services LLC
("Aurora"), and U.S. Bank National Association ("U.S. Bank") signed a
Securitization Subservicing Agreement.  [Dkt. 64.]  Wells Fargo was identified as

Servicer, Lehman Brothers as Seller, Aurora as Master Servicer, and U.S. Bank as trustee. *Id*. at WF001360. In the Securitization Subservicing Agreement, Wells Fargo was appointed Servicer for certain mortgage loans held in trust by U.S. Bank which were previously serviced by Option One Mortgage Corporation. *Id*. at 10-11, 13. These mortgage loans included "[a]ny Mortgage Loan registered with MERS on the MERS system." *Id*. at 6.

As Servicer for all mortgage loans registered with MERS, Wells Fargo was required to "accurately and fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information . . . on its borrower credit files to [a number of specified] credit repositories . . . on a monthly basis." *Id*. at 33.

The Securitization Subservicing Agreement filed with the Court is largely redacted, including a section identified in the table of contents as provisions relating to the successor to the servicer. *Id*. at iii. Defendants assert Option One Mortgage Corporation provided Wells Fargo with copies of Plaintiffs' loan applications, note, mortgage, and credit reports "as part of the servicing transfer." [Dkt. 54 at 3.] Although no unredacted provision in the Securitization Subservicing Agreement calls for such a transfer of documents, such a provision can be reasonably inferred to exist because the successor loan servicer would not be capable of servicing the loan if it did not have the loan documents. [Dkt. 64.]

On September 28, 2006, America's Servicing Company ("ASC") sent Plaintiffs a letter indicating Plaintiffs' mortgage loan had been transferred to ASC

for servicing.  [Dkt. 55-9 at WF000036.]  The sworn affidavit of Brandon McNeal, Vice President of Loan Documentation for Wells Fargo, indicates "ASC is d/b/a Wells Fargo Bank, N.A., which services loans for other investors under the America's Servicing Company name."  [Dkt. 55 at ¶ 2.]  As Plaintiffs' mortgage loan servicer, Defendants sent Plaintiffs monthly mortgage statements (*e.g.* Dkt. 55-10), processed Plaintiffs' monthly mortgage payments (Dkt. 55-11), and kept records of Plaintiffs' mortgage loan activity (*e.g.* Dkt. 55-12).

On May 27, 2009, Plaintiffs called Defendants and requested a modification of their mortgage loan.  [Dkt. 55-12 at 3.]  On September 4, 2009, Defendants obtained Plaintiffs' credit report.  [Dkt. 55-13.]  Defendants cited information attributed to the Credit Bureau when evaluating Plaintiffs' loan modification request on September 16, 2009.  [Dkt. 55-14 at 2-3.]  Defendants assert they obtained Plaintiffs' credit report in order to evaluate Plaintiffs' eligibility for the loan modification requested on May 27, 2009.  [Dkt. 55 at 6.]

On February 19, 2010, Plaintiffs contacted Defendants a second time seeking a loan modification due to a loss of income when Ms. Gallaher lost her job.  [Dkt. 55-16 at 4.]  Defendants obtained Plaintiffs' credit report that day (Dkt. 55-15) and referenced it when evaluating Plaintiffs' loan modification eligibility (Dkt. 55-16 at 3).

On April 15, 2010, Plaintiffs wrote letters to ASC requesting mortgage loan modifications.  [Dkt. 55-18.]  On April 21, 2010, Plaintiffs completed a Hardship Affidavit as part of an application to modify their loan under the federal government's Home Affordable Modification Program.  [Dkt. 55-17.]  The Hardship

Affidavit included an acknowledgment signed by Plaintiffs stating "I/we understand the Servicer will pull a current credit report on all borrowers obligated on the Note . . . to evaluate my/our eligibility for a loan modification or other workout."  *Id.* at WF000420.  On May 6, 2010, ASC obtained Plaintiffs' credit report.  [Dkt. 55-19.]

On October 12, 2010, Plaintiffs submitted a Request for Modification and Affidavit ("RMA") to modify their mortgage loan through the Making Home Affordable Program.  [Dkt. 55-21.]  The RMA identifies ASC as the loan servicer. *Id.* at WF000057.  Plaintiffs signed an acknowledgement in the RMA stating "I understand the Servicer will pull a current credit report on all borrowers obligated on the Note" and "collect and record personal information, including . . . credit score, income, payment history, government monitoring information, and information about account balances and activity.  I understand and consent to the disclosure of my personal information . . . by Servicer to (a) the U.S. Department of the Treasury; (b) Fannie Mae and Freddie Mac . . . ; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my . . . mortgage loan(s); (d) companies that perform support services in conjunction with Making Home Affordable; and (e) any HUD-certified housing counselor."  *Id.* at WF000059. Plaintiffs submitted subsequent RMAs identifying ASC as the loan servicer and acknowledging that the servicer would pull Plaintiffs' credit report, collect and record personal information and deliver it to the same entities identified in the October 12, 2010 RMA.  Those subsequent RMAs are dated May 29, 2011 (Dkt. 55-23), September 29, 2011 (Dkt. 55-25), April 18, 2012 (Dkt. 55-27), November 15,

2012 (Dkt. 55-29), and March 13, 2013 (Dkt. 55-31, relying on November 2012 ASC letter as not yet expired). Plaintiffs submitted additional hardship letters to ASC requesting loan modifications concurrent with each RMA. [Dkt. 55-22 (October 12, 2010 ASC letter); 55-24 (June 4, 2011 ASC letter); 55-26 (September 29, 2011 ASC letter); 55-28 (April 18, 2012 ASC letter); 55-30 (November 12, 2012 ASC letter).]

On February 27, 2013, Wells Fargo pulled Plaintiffs' credit report. [Dkt. 55-32.] An excerpt from Wells Fargo's LMT Process Notes dated April 8, 2013 states Plaintiffs' loan modification was denied because Plaintiffs were "unable to achieve target payment." [Dkt. 55-33 at 2.] The "decision [to deny Plaintiffs' loan request was] made using CBR dated 02/27/2013." *Id.* at 3.

On January 25, 2014, Wells Fargo received an Automated Credit Dispute Verification ("ACDV") from TransUnion pertaining to Plaintiffs' Mortgage Loan. [Dkt. 56-2 (ACDV Report); 56-3 (Record that Wells Fargo received ACDV).] The dispute "concerned the accuracy of the Gallahers' Mortgage Loan balance being reported" and in response Wells Fargo "changed the balance information to reflect that the amount past due was $255,320.00 instead of the lower $250,525.00 figure received from TransUnion." [Dkt. 56 (Affidavit of Brian Drummond, Vice President of Credit Reporting and Credit Disputes, Wells Fargo Bank) at ¶ 8; 56-2 (ACDV Report).] Wells Fargo again pulled Plaintiffs' credit report on February 6, 2014. [Dkt. 55-34.]

Brian Drummond, Vice President of Credit Reporting and Credit Disputes for Wells Fargo Bank, N.A. asserts there is "no indication in Wells Fargo's

business records that it ever received a dispute from any credit reporting agency concerning the name of the furnisher who was reporting the information on the Gallahers' credit report (i.e., that the Gallahers' Mortgage Loan debt should be reported under a different name than Wells Fargo was reporting it under)." [Dkt. 56 at ¶ 9 (Affidavit of Brian Drummond).] In their Objections and Responses to Defendant's First Set of Requests for Production, Plaintiffs asserted there is no documentation of their "complaints or disputes . . . submitted to credit reporting agencies" because "Plaintiffs' disputes were lodged over the phone with live CRA representatives." [Dkt. 57-1 at ¶ 9.]

Plaintiffs stated in their Objections and Responses to Defendants' First Set of Requests for Production that, as of October 26, 2016, they did not possess documents concerning their allegation that they "have suffered significant economic harm and overall family instability as a result of defendant's erroneous credit reporting and their failure to verify and or validate the alleged debt." [Dkt. 57-1 at ¶ 12.] In the same document, Plaintiffs asserted they possessed no "documents concerning [their] allegation that creditors . . . denied Plaintiffs credit based on deteriorated credit scores and credit worthiness." *Id.* at ¶ 13. Plaintiffs further asserted they possessed no "documents concerning [their] alleged damages." *Id.* at ¶ 14. At his deposition, Jeffery Gallaher asserted he has suffered "general discord with the family in regards to, in regards to just dealing with a lot of the court stuff, in regards to having to move, having to relocate, things of that nature." [Dkt. 57-2 at 103.] Mr. Gallaher also stated he is owed

$3,000 per month for each month Defendants reported inaccuracies on Plaintiffs' credit report.  [*Id.* at 99.]

Plaintiffs do not dispute that the Superior Court entered a final judgment of foreclosure on Plaintiffs' home in favor of U.S. Bank Mortgage Pass-Through [Dkt. 57-2 at 94 (Deposition of Jeffery Gallaher) (acknowledging final judgment of foreclosure); Dkt. 1, Ex. A at 16 (identifying U.S. Bank Mortgage Pass-Through as plaintiff in the foreclosure proceeding)], on whose behalf Wells Fargo was acting as loan servicer.

II.     Legal Standards

 "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."  Fed. R. Civ. P. 56(a).

In order to prevail, the moving party must sustain the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.*  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some

evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251. Indeed, summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local R. Civ. P. 56(a)(3); *see also* Fed. R. Civ. P. 56(c)(4). A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Id.*

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record. Fed. R. Civ.

P. 56(c)(3).  If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary judgment on the basis of the undisputed facts.  D. Conn. L. Rule 56(a)(3) (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)(1) or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").[2]

As Plaintiffs are proceeding *pro se,* their submissions, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 511 U.S. 89, 94 (2007); *see also Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012).

III.    <u>Analysis</u>

A.    <u>Plaintiffs' FCRA Claim</u>

Defendants challenge Plaintiffs' FCRA claims for failure to establish that Defendants received notice of a consumer dispute, failure to allege Defendants acted willfully, and lack of standing.  The Court discusses each argument in turn below.

---

[2] While Rule 56(e) also permits the Court to give a party the "opportunity to properly support or address the fact," such a course of action is not warranted. Defendants complied with Local Rule 56(b)'s mandate to provide *pro se* plaintiffs with notice of the procedures required to oppose a motion for summary judgment.  [See Dkt. 56].  Plaintiffs therefore were aware of these requirements before filing her opposition, and has not suggested that she will produce a brief that comports with Rule 56 if given the opportunity to do so.

### i. Notice: Whether Wells Fargo received notice of a dispute from a credit reporting agency of the alleged inaccuracy/whether such notice was required

Defendants first assert no credit reporting agency notified them of any dispute alleging that either Defendants improperly furnished Plaintiffs' credit information in its own name or improperly accessed Plaintiffs' credit report. [Dkt. 53 at 17, 20.] Defendants assert that the only notice they received from a credit reporting agency concerning the Plaintiffs was dated January 15, 2014 and challenged the accuracy of Plaintiffs' reported mortgage loan balance. *Id.* Defendants argue that without notice from a credit reporting agency, Defendants had no duty to investigate information it furnished regarding, or its access to, Plaintiffs' credit report. [Dkt. 53 at 20.] As Defendants accurately note, Plaintiffs are estopped from disputing the mortgage debt itself. [*See* Dkt. 35 (Order on Motion to Dismiss) at 29.]

Plaintiffs respond that they submitted three separate disputes with three major credit reporting agencies, and that FRCA Section 1681 imposed a duty on those agencies to forward a credit dispute verification ("CDV") form to the loan furnisher (Wells Fargo), which triggered Defendants' duty to investigate. [Dkt. 73 at 1-2.] Plaintiffs assert this procedure refutes Defendants' assertion that they did not receive notice from credit reporting agencies of Plaintiffs' dispute. *Id.* at 2. Plaintiffs offer no evidence that they filed disputes regarding Wells Fargo representing itself as Plaintiffs' loan servicer or accessing Plaintiffs' credit reports.

The FCRA seeks to ensure "that consumer reporting agencies adopt

reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b); *see also Kinel v. Sherman Acquisition II LP*, No. 05 Civ. 3456 (RCC) (THK), 2006 WL 5157678, at *13 (S.D.N.Y. Feb. 28, 2006) (explaining the FCRA imposes obligations on entities which furnish credit information to reporting agencies). Under the FCRA, an entity which furnishes credit information to reporting agencies (a "furnisher") must report accurate information and has an ongoing duty to correct and update inaccurate information. 15 U.S.C. § 1681s-2(a).[3]

If a consumer notifies a credit reporting agency of an error on their credit report both the credit reporting agency and the furnisher of the disputed information "have a duty to reasonably investigate and verify that the information is accurate." *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012). "[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . the agency shall, free of charge, conduct a reasonable reinvestigation." 15 U.S.C. § 1681i(a)(1)(A). "[T]he agency shall provide notification of the dispute to any person who provided any item of information in dispute." 15 U.S.C. § 1681i(a)(2)(A). Furnishers of information have prescribed duties triggered by the receipt "of notice pursuant to section 1681i(a)(2) of this title [18] of a dispute with regard to the completeness or

---

[3] Only "federal and state authorities" may bring claims for violations of section 1681s-2(a). *See Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012); *see also* 15 U.S.C. § 1681s-2(d).

accuracy of any information provided by a person to a consumer reporting agency." 15 U.S.C. § 1681s-2(b)(1).

If a consumer files a dispute directly with a furnisher, the furnisher only has a duty to investigate if the dispute pertains to:

(1) The consumer's liability for a credit account or other debt . . . such as . . . whether there is or has been identity theft or fraud against the consumer . . . ;

(2) The terms of a credit account or other debt with the furnisher, such as . . . the type of account, principal balance, [or] scheduled payment amount . . . ;

(3) The consumer's performance or other conduct concerning an account . . . , such as . . . the current payment status, high balance, date a payment was made, [or] amount of a payment made . . . ;

(4) Any other information contained in a consumer report regarding an account or other relationship with the furnisher that bears on the consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

16 C.F.R. § 660.4. The FCRA provides no contingency for liability where a consumer has not notified the credit reporting agency or furnisher of a dispute. *See* 15 U.S.C. § 1681s-2(b) ("Duties of furnishers of information *upon notice of dispute*") (emphasis added).

Plaintiffs have offered no evidence that they submitted disputes to credit reporting agencies or directly to Defendants. Defendants have offered a sworn affidavit of their Vice President Vice President of Credit Reporting and Credit Disputes that "[t]here is no indication in Wells Fargo's business records that it ever received a dispute from any credit reporting agency concerning the name of the furnisher who was reporting the information on the Gallahers' credit report." [Dkt. 56 (Affidavit of Brian Drummond, Vice President of Credit Reporting and

Credit Disputes, Wells Fargo Bank) at ¶ 9.] Plaintiffs' mere allegations are insufficient to defeat summary judgment. *Welch-Rubin*, 2004 WL 2472280, at *1. The Court has been presented with no admissible evidence "upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251. Accordingly, judgment is entered in behalf of the Defendant on these claims.

### ii. Legitimate Purpose for Reporting Credit Information

Even if Plaintiffs had notified Defendants of their dispute, Defendants assert there is no evidence that Defendants willfully or negligently violated the FCRA, and accordingly cannot be held liable in a private right of action. [Dkt. 53 at 18 (citing *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445 n.6 (2d Cir. 2015).] Plaintiffs do not respond to this argument.

In relevant part, the FCRA states a consumer reporting agency may furnish a consumer report only under certain circumstances, including "[i]n accordance with the written instructions of the consumer to who it relates" or "[t]o a person which it has reason to believe – (A) intends to use the information in connection with a cr4edit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or . . . (E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation." 15 U.S.C. § 1681b(a)(3).

When a credit agency notifies a furnisher of a consumer dispute, the

furnisher must: (i) conduct an investigation, (ii) review all relevant information provided by the consumer reporting agency, (iii) report the results of the investigation to the consumer reporting agency; and (iv) if the investigation finds that the information is incomplete or inaccurate, to report those results to all other consumer reporting agencies to which the person furnished the information. 15 U.S.C. § 1681-2(b)(1). "While the Second Circuit has not yet defined the specific contours of a furnisher's investigatory responsibility under this statute, courts both within and outside the Circuit have 'assum[ed] a reasonableness standard for judging the adequacy of the required investigation.'" *Dickman v. Verizon Commc'ns, Inc.*, 876 F. Supp. 2d 166, 172 (E.D.N.Y. 2012) (quoting *Okocha v. HSBC Bank USA, N.A.*, 700 F. Supp. 2d 369, 374 (S.D.N.Y. 2010)).

If a furnisher "willfully fails to comply with any requirement under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of (1)(A) Any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or. . . (2) such amount of punitive damages as the court may allow; and (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court." actual damages or statutory damages of $100 to $1,000 per violation, costs of the action and attorney's fees, and possibly punitive damages." 15 U.S.C. § 1681n(a). In addition, "[a]ny person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any

consumer is liable to that consumer in an amount equal to the sum of – (1) any actual damages sustained by the consumer as a result of the failure; and (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681o(a).

As to Plaintiffs' argument that Defendants inaccurately stated in Plaintiffs' credit report that Plaintiffs owed the Defendants the balance of their $579,500.00 mortgage, Defendants assert the information was not inaccurate.  In support, Defendants cite the Securitization Subservicing Agreement, which names Wells Fargo as servicer of the mortgage, and the 2014 Credit Reporting Resource Guide published by the Consumer Data Industry Association, which states it is the industry standard to state the "name of the processing company sending the data; i.e., data furnisher or processor" in the "Header" to a consumer report, which "must be the first record provided and include[] information necessary to identify the reporter."  [Dkt. 56-1 at 4.1 – 4.3.]

As to Plaintiffs' argument that Defendants impermissibly obtained Plaintiffs' credit report, Defendants argue there are two reasons their actions were lawful.  [Dkt. 53 at 23.]  First, Defendants assert they obtained Plaintiffs' credit report "in accordance with the written instructions of the consumer to whom it relates."  15 U.S.C. § 1681b(a)(2).  Defendants reason that Plaintiffs repeatedly requested hardship assistance, loan modification, or other assistance via telephonic or written communication.  [Dkt. 55-12 at 3 (May 27, 2009 telephonic request); Dkt. 55-18 (April 15, 2010 written request); Dkt. 55-22

(October 12, 2010 written request); Dkt. 55-24 (June 4, 2011 written request); Dkt. 55-26 (September 29, 2011 written request); Dkt. 55-28 (April 18, 2012 written request); Dkt. 55-30 (November 12, 2012 written request).]  Concurrent with Plaintiffs' requests, Plaintiffs' Hardship Affidavit and multiple Requests for Modification and Affidavits ("RMA") included language Defendants argue all constituted written instructions under Section 1681b(a)(2).  [Dkt. 55-17 (April 21, 2010 Hardship Affidavit); Dkt. 55-21 (October 12, 2010 RMA); Dkt. 55-23 (May 29, 2011 RMA); Dkt. 55-25 (September 29, 2011 RMA); Dkt. 55-27 (April 18, 2012 RMA); Dkt. 55-29 (November 15, 2012 RMA); Dkt. 55-31 (March 13, 2013 RMA).]  The Hardship Affidavit clearly states Plaintiffs "understand the Servicer will pull a current credit report on all borrowers obligated on the note [and will] use this information to evaluate my/our eligibility for a loan modification or other workout."  Dkt. 55-17 at WF000420.  The RMA certifications each stated "I understand the Servicer will pull a current credit report on all borrowers obligated on the Note [and] will use the information in this document to evaluate my eligibility for a loan modification."  *See, e.g.*, Dkt. 55-21 at WF000059.

In addition to acting according to Plaintiffs' written instructions, Defendants assert they lawfully accessed Plaintiffs' credit report because they had "reason to believe" the credit report was intended[4] to be used "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the consumer on whom the information is to be

---

[4] The intent at issue is that of the party obtaining the credit report, in this case the Defendants.  *Bentley*, 156 F. Supp. 3d 274, 297 (D. Conn. 2015) ("In assessing the 'reason to know' aspect of this authorized purpose, the Court's focus is on the intent of the party obtaining the credit report").

furnished and involving the extension of credit to, or review or collection of an account of, the consumer," or intended to be used "in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation."  15 U.S.C. § 1681b(a)(3)(A), (E).  Defendants further assert each subsequent time they obtained Plaintiffs' credit report (on May 6, 2010, February 27, 2013, and February 6, 2014), Defendants did so with the intent to use the information to evaluate Plaintiffs' eligibility for loan modification.  *Id.* at 25. Plaintiffs do not respond to Defendants' arguments.  The Court's own review of the record indicates Plaintiffs last requested a loan modification or hardship assistance on March 13, 2013.  [Dkt. 55-31.]  Defendants last accessed Plaintiffs' credit report on February 6, 2014.  [Dkt. 55-34.]  Defendants do not offer evidence indicating why they accessed Plaintiffs' credit report at that time, however, the temporal proximity of Plaintiffs' dispute regarding their mortgage loan balance to the date of access suggests a legitimate reason.  Record evidence indicates Defendants did so twelve days after receiving an Automated Credit Dispute Verification from TransUnion pertaining to Plaintiffs' Mortgage Loan.  [Dkt. 56-2 (ACDV Report); 56-3 (Record that Wells Fargo received ACDV).]  In response to Plaintiffs' complaint, Wells Fargo apparently investigated, discovered the reported loan balance was erroneously low, and corrected the error by increasing the balance from $250,525.00 to $255,320.00.  [Dkt. 56 (Affidavit of Brian Drummond, Vice President of Credit Reporting and Credit Disputes, Wells Fargo Bank) at ¶ 8; 56-2 (ACDV Report).]

Plaintiffs' multiple requests for loan modification included language stating their understanding that Defendants would access their credit reports to assess their loan eligibility; Plaintiffs offer no evidence their RMAs and Hardship Affidavit should not be interpreted as written instructions to evaluate and process their loan modification requests under 15 U.S.C. § 1681b(a)(2). Nor do Plaintiffs offer any evidence suggesting their multiple loan modification requests should not have authorized Defendants to access their credit report with the permissible intent to evaluate their request under 15 U.S.C. § 1681b(a)(3)(A), (E). Even if Plaintiffs had offered such evidence, pulling a credit report in response to an application to assess the applicant's suitability for a loan "fits squarely within the permissible purposes for obtaining a credit report set forth in section 1681b(a)." *Bentley*, 156 F. Supp. 3d at 297.

Plaintiffs' claim that Defendants falsely claimed they held Plaintiffs' mortgage loan on Plaintiffs' credit report in violation of the FCRA similarly lacks support. Plaintiffs offer no evidence suggesting the illegitimacy of the Securitization Subservicing Agreement naming Wells Fargo their loan servicer, or calling into question the Consumer Data Industry Association's instruction for loan servicers to identify themselves on credit reporting documents. With no evidence to support their allegations, there is no genuine issue of material fact for trial. *Anderson*, 477 U.S. at 250.

Finally, Plaintiffs do not assert Defendants either willfully or negligently failed to perform their duties as furnishers accurate of information to a credit reporting agency. Had they done so, these claims would fail. The record

indicates that Wells Fargo responded promptly to the single complaint it received and that the error it corrected as a result had been in the Plaintiffs' favor. For the reasons stated below, the Court grants summary judgment for Defendants on Plaintiffs' credit access and disclosure claims.

### iii. Standing under the FCRA

Even if Plaintiffs' FCRA claims could survive on the merits, they would be barred for lack of standing. To prove Article III standing, plaintiffs must allege (1) a personal "injury-in-fact"; (2) a "causal connection between the injury and the conduct complaint of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (international quotations and citations omitted). To establish the first element, a plaintiff must establish he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. An injury is particularized if it "affect[s] the plaintiff in a personal and individual way," and concrete if it is "real, and not abstract." *Spokeo*, 136 S. Ct. at 1548.

The Supreme Court has held that alleging a violation of the FCRA's procedural requirements or an inaccuracy in a credit report is insufficient, by itself, to show concrete harm and establish standing. *Spokeo*, 136 S. Ct. at 1550. Because there are procedural violations that may cause no risk of harm, like disseminating accurate information without the required notice to users, the plaintiff must establish that the particular violation alleged "entail[s] a degree of

risk sufficient to meet the concreteness requirement" of standing. *Id*. The same is true of credit reporting inaccuracies that may prove harmless, such as an incorrect zip code. Because an FCRA violation may result in no harm, and no "material risk of harm," a plaintiff must assert more than a bare violation to establish a concrete injury for standing. *Id*.

In addition, to establish an injury as "actual or imminent," it is insufficient to assert an "increased risk" of future harm. *Ross v. AXA Equitable Life Ins. Co.*, 15-2665-cv, 2017 WL 730266, at *3 (2d Cir. Feb. 23, 2017) (summary order) (finding insufficient plaintiff's argument that an insurer's misleading representation in violation of New York insurance law caused an increased risk that insurers would be unable to pay plaintiff's claims in the event of a future economic downturn).

Defendants assert Plaintiffs have not alleged a concrete and particularized injury because Plaintiffs have asserted only that Defendants inaccurately reported their debt, but not that the inaccuracy caused any harm. [Dkt. 53 at 14.] Plaintiffs allege they have been denied credit "based on deteriorated credit scores and credit worthiness," and assert "general discord with the family in regards to, . . . having to move, having to relocate," but do not articulate how those injuries resulted from Defendants' alleged FCRA violations rather than Plaintiffs' mortgage foreclosure. [Dkt. 57-1 (Plaintiffs' Responses to Requests for Production of Documents) at ¶¶ 12 – 14; Dkt. 57-2 (J. Gallaher Deposition Transcript) at 103.] Plaintiffs' injuries appear more likely to flow from the unfortunate and understandable distress of the mortgagee's decision to enforce the mortgage loan through foreclosure rather than from any reporting of

Plaintiffs' inability to make the full and timely mortgage payments which they were contractually bound to make under the mortgage loan documents. In fact, Plaintiffs stated in response to Defendants' written discovery that they possessed no evidence of injury caused by any inaccurate or unauthorized reporting by Defendants. [Dkt. 57-1 at ¶¶ 12 - 14.] This is not surprising, as the Defendants' only error was both negligible and in Plaintiffs' favor.

Accordingly, because Plaintiffs have failed to establish a question of material fact regarding whether Defendants violated the FCRA or caused Plaintiffs any injury by accessing Plaintiffs' credit report and naming Defendants as the entity to whom Plaintiffs mortgage should be paid, Defendants' motion for summary judgment as to Plaintiffs' FCRA claims is GRANTED.

B. <u>Plaintiffs' Invasion of Privacy Claim</u>

Plaintiffs also allege Defendants accessed Plaintiffs' credit report willfully, maliciously, and without legal right in violation of Connecticut's protection against unlawful invasion of privacy. Defendants assert the invasion of privacy claim is precluded because Defendants accessed Plaintiffs' credit report for a legitimate purpose, the claim is preempted by the FCRA, and any claim based on accessing Plaintiffs' credit report before December 16, 2011 is time-barred. The Court addresses each argument in turn below.

i. <u>Lawful Purpose: Whether Wells Fargo obtained Plaintiffs' credit reports for authorized and lawful purposes</u>

Plaintiffs' claim that Defendants illegally obtained their credit report falls under one of four categories of invasion of privacy torts in Connecticut: an "unreasonable intrusion upon the seclusion of another." ***Foncello v. Amorossi***,

284 Conn. 225, 234 (2007) (explaining Connecticut's four types of invasion of privacy). To establish an intrusion upon seclusion, Plaintiffs must show that Defendants "intentionally intrud[ed], physically or otherwise, upon the solitude or seclusion of [Plaintiffs] or [their] private affairs or concerns," and that Defendants' intrusion "would be highly offensive to a reasonable person." *Palkimas v. Bella*, 2012 WL 1048868, at *6 (D. Conn. Mar. 28, 2012).

Defendants assert they acted reasonably when they legally accessed Plaintiffs' credit report because they were Plaintiffs' mortgage loan servicers. [Dtk. 53 at 29.] In support, Defendants note this Court's finding in its Order on Defendants' Motion to Dismiss that the Connecticut Superior Court already determined U.S. Bank held the mortgage note in question. [Dkt. 35 at 21.] Defendants also offer the Securitization Subservicing Agreement between Wells Fargo, Lehman Brothers, Aurora Loan Services, LLC, and U.S. Bank National Association which granted Wells Fargo, as servicer of Plaintiffs' mortgage loan, the right and responsibility to furnish information to credit reporting agencies. [Dkt. 64 at 33.]

Plaintiffs reply that Defendants have shown no evidence of a legal contractual relationship between Defendants and the "actual lender of [the] mortgage loan account." [Dkt. 71 at 3.] Plaintiffs offer no evidence calling into question the legitimacy of the Securitization Subservicing Agreement or otherwise suggesting Wells Fargo did not act reasonably as Plaintiffs' mortgage loan servicer when accessing Plaintiffs' credit report. Rather, Plaintiffs attempt to cast doubt on the legitimacy of the Agreement by asserting perceived

inconsistencies in the record, including that the Securitization Subservicing Agreement names Lehman Brothers as the Seller of Plaintiffs' mortgage loan, which conflicts with records that Plaintiffs executed a note and mortgage to secure the note to BNC, not Lehman Brothers. [Dkt. 71 at 6-7.] Plaintiffs assert if Lehman Brothers held Plaintiffs' mortgage note, then BNC's sale, transfer, or assignment of Plaintiffs' mortgage loan to Wells Fargo was invalid, because BNC could not sell, transfer, or assign something they did not hold. *Id.* at 4. Plaintiffs have offered no evidence in support of their allegation. There is no material question of fact as to the legitimacy of the Securitization Subservicing Agreement and no reasonable juror could conclude Defendants' accessing Plaintiffs' credit report as their legal mortgage loan servicer was "highly offensive." Plaintiffs' state law privacy claim is unavailing and judgment is hereby entered in favor of Defendants on this claim.

ii. <u>Preemption: Whether the invasion of privacy claim is preempted by the FCRA</u>

Even if Plaintiffs had offered evidence suggesting Defendants unlawfully accessed their credit report in violation of their right to privacy, Defendants assert there is no evidence they did so with malice or willful intent to injure Plaintiffs, and accordingly Plaintiffs' invasion of privacy claim is preempted by the FCRA.

As discussed in the Court's Order on Defendants' Motion to Dismiss, the operative preemption language in the FCRA states:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature . . . invasion of privacy . . . with respect to the reporting of information against any

> consumer reporting agency, any user of information, or any person who
> furnishes information to a consumer reporting agency based on
> information disclosed pursuant to section 1681g, 1681h, or 1681m of
> this title, or based on information disclosed by a user of a consumer
> report to or for a consumer against whom the user has taken adverse
> action, based in whole or in part on the report except as to false
> information furnished with malice or willful intent to injure such
> consumer.

15 U.S.C. § 1681h(e). For the reasons discussed in the Court's earlier ruling [Dkt. 35 at 30-32], courts in this district and throughout the Circuit have interpreted Section 1681h(e) as preempting "state law claims based on action of a furnisher of information after the furnisher has received notice of inaccuracies." *Ryder v. Washington Mut. Bank, FA*, 371 F. Supp. 2d 152, 154 (D. Conn. 2005) (quoting *Kane v. Guaranty Residential Lending, Inc.*, No. 04-CV-4847 (ERK), 2005 WL 1153623, at *8 (E.D.N.Y. May 16, 2005)); *see also Ahmed v. Bank of Am.*, No. 09-cv-2550 (DLI) (RLM), 2010 WL 3824168, at **3-4 (E.D.N.Y. Sept. 24, 2010). Where the contested action took place before notice of any inaccuracies was received, as is the case here (where, as discussed above, notice was never given), a state claim for invasion of privacy is preempted unless the plaintiff can establish "malice or willful intent to injure." 15 U.S.C. § 1681h(e).

Defendants argue there is no evidence upon which a reasonable fact-finder could conclude that Defendants acted with malice or willful intent to injure Plaintiffs when they obtained Plaintiffs' credit report or furnished it to credit reporting agencies. [Dkt. 53 at 31.] As Defendants assert, Plaintiffs have offered no evidence suggesting malice or willful intent to injure. Nor have Plaintiffs offered the evidence of bad faith contemplated in the Court's Decision on Defendant's Motion to Dismiss, that Defendants altered the substance of

Plaintiffs' credit report by adding inaccurate information. [Dkt. 35 at 30.] As discussed above in this Decision, Plaintiffs have failed to offer evidence that Wells Fargo inaccurately represented that it was owed the balance of Plaintiffs' mortgage loan. [Dkt. 35 at 30.] There is no question of fact upon which a jury could determine that Wells Fargo acted maliciously or with willful intent to injure Plaintiffs; Plaintiffs' invasion of privacy claim is preempted by FCRA Section 1681h(e). Judgment is entered in favor of the Defendant on Plaintiffs' invasion of privacy claim.

### i. Statute of Limitations

Finally, even if Plaintiffs' invasion of privacy claim could survive on the merits and were not preempted, Defendants assert claims based on actions preceding December 16, 2011 are time-barred. Plaintiffs respond that on July 23, 2013, a Connecticut court ordered mediation on Plaintiffs' foreclosure to cease and on November 6, 2013, the Connecticut court granted a Motion for Strict Foreclosure of Plaintiffs' mortgage loan. [Dkt. 73 at 2.] At that time, Plaintiffs contend there were also no current RMAs or loan applications on file and there was accordingly no permissible purpose under 15 USC § 1681s-2 or 15 USC § 1681b for Defendants to access or use Plaintiffs' credit reports. *Id*. at 2-3. Plaintiffs conclude that when Defendants accessed and used Plaintiffs' credit report on February 6, 2014, their actions were unlawful. *Id*. at 2.

Plaintiffs' invasion of privacy claim is subject to a three-year statute of limitations. Conn. Gen. Stat. § 52-577; *see also Bhatia v. Conn. Dep't of Children & Families*, 317 F. App'x 51, 52 (2d Cir. 2009) (applying the three-year statute of

limitations imposed by Section 52-577 to an invasion of privacy claim).  As Plaintiffs filed their lawsuit on December 16, 2014, Plaintiffs' claims of invasion of privacy predating December 16, 2011 are time-barred.  Any invasion of privacy claim asserted based on Defendants' access to or use of Plaintiffs' credit report on September 4, 2009, February 19, 2010, and May 6, 2010 must be dismissed.

Plaintiffs' argument does not alter the time-barred nature of allegations predating December 16, 2011, without regard to whether they were in fact committed without Plaintiffs' consent.  To the extent Plaintiffs' argument could be construed as an argument supporting the merits of their invasion of privacy claim as to Defendants' accessing Plaintiffs' credit report on February 6, 2014, the argument also falls short.  Twelve days before Defendants last accessed Plaintiffs' credit report, on January 25, 2014, TransUnion submitted to Defendants an Automated Credit Dispute Verification ("ACDV") pertaining to Plaintiffs' Mortgage Loan.  [Dkt. 56-2 (ACDV Report); 56-3 (Record that Wells Fargo received ACDV).]  The ACDV identifies Jeffery A. Gallaher in a section titled "Request Data," suggesting Mr. Gallaher initiated the request for review.  *Id.*  The dispute regarded the "accuracy of the Gallahers' Mortgage Loan balance being reported." [Dkt. 56 (Affidavit of Brian Drummond, Vice President of Credit Reporting and Credit Disputes, Wells Fargo Bank) at ¶ 8.]  Not only would Defendants have acted reasonably by accessing Plaintiffs' credit report when investigating the dispute, but the evidence suggests Plaintiffs themselves initiated the request. Plaintiffs cannot now establish that investigation was improper.

**IV.** **Conclusion**

For the foregoing reasons, the Defendants' Motion for Summary Judgment is GRANTED as to all claims. The Clerk is directed to close this file.

IT IS SO ORDERED, ADJUDGED AND DECREED, this 15th day of May 2017, Hartford, Connecticut

_____/s/_____
Vanessa L. Bryant,
United States District Judge
